The STATE of Ohio, Appellant,

v.

McMILLAN, Appellee.

[Cite as *State v. McMillan* (1993), 91 Ohio App.3d 1.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 62382.

Decided Sept. 27, 1993.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, *Edward Feran* and *Winston Grays,* Assistant Prosecuting Attorneys, for appellant.

*Jaime P. Serrat,* for appellee.

PATTON, Presiding Judge.

Plaintiff–appellant the state of Ohio (the "state") appeals from the trial court's grant of defendant William McMillan's motion to suppress illegally seized evidence. The trial court concluded that McMillan's co-defendant below, Tonya Blackman, did not voluntarily consent and could not have voluntarily consented to a search of their shared residence.

The relevant facts are as follows: This case is a companion case to *State v. McMillan* (Sept. 16, 1993), Cuyahoga App. No. 62795, unreported, 1993 WL 372275. McMillan and Blackman cohabitated at an apartment at Gates Mills Towers, the apartment that was the subject of the within search.

Events transpired prior to the search of the apartment. In the early morning hours of the day in question, McMillan was initially stopped by Mayfield Heights police officers for driving a vehicle without license plates and failing to produce an identification with no independent means of identification verification. He was seen making furtive gestures while police were in pursuit. McMillan gave a false name and Social Security number and it was determined that he was driving a black Corvette convertible which was registered to an unrelated female in Michigan. His story appeared suspicious to police. An open beer bottle was discovered behind the passenger seat resting against a towel. The towel contained a large amount of cash. Also, the butt of a handgun was seen jutting out from under the driver's side.

The police permitted McMillan to make a phone call. He called Blackman allegedly in order that she bring his identification. Shortly after the phone call,

Blackman, along with their four-month-old baby girl, arrived on the scene. Blackman was apparently confused as to why she was summoned to the scene. She was unaware that she was supposed to bring McMillan's identification. Thereafter, she did not wish to answer questions regarding McMillan's name, employment or any other details regarding herself or McMillan. However, lacking probable cause to take her into custody, and not yet arrested, the police believed she was intentionally obstructing their investigation and both were transported to the station along with their baby daughter.

Blackman was placed in a cell with her daughter and sustained further questioning by the police regarding McMillan's true identity. According to Blackman, she kept requesting an attorney and was denied each request. The police, during Blackman's four-hour detainment, sent out for diapers and formula for the infant instead of making alternate plans for provisions for the baby.

Several conversations took place between Blackman and Sergeant Alvin Schmitt after Blackman was read her rights.

At approximately 6:40 a.m., Blackman was brought to the Mayfield Heights Detective Bureau where she spoke with Detective Lieutenant Harold DeBoe, the supervising detective in charge of the department. Det. DeBoe was called in as the police suspected involvement in heavy drug trafficking.

Det. DeBoe told Blackman that he suspected McMillan was heavily involved in drug trafficking and that he was concerned for her safety as well as her baby's safety. It is gleaned from the record that the police were determined to detain Blackman for as long as it took in order to get information about McMillan.

Det. DeBoe, after their fifteen-minute talk, asked Blackman for her consent to search her apartment, which she shared with McMillan. She eventually decided to let the police in the apartment as the following testimony reveals:

"A. [Blackman] And, he said to me, 'You're wasting our time. If you don't want to sign this thing, we'll get a warrant and you'll just go back to jail and sit for at least two hours, 'cause that's about the time it takes for the warrants to come in.'

"Q. Who said that to you?

"A. Detective DeBoe.

"Q. Okay. After he said that, what happened?

"A. I was scared. I didn't want to go back to jail. I signed the consent.

"* * *

"A. * * * I was afraid to go back to jail. It wasn't so much as what they were as to what they would do with me.

"Q. Well, they would take you back to jail; that would be something the police would do with you, isn't that right?

"A. Yes.

" * * *

"Q. You entered a plea of guilty in this case because you were afraid; is that correct?

"A. Yes."

Det. DeBoe arranged the search and they proceeded to the apartment. They arrived at approximately 7:15 a.m. Once inside, and prior to searching, Blackman made several phone calls and took some incoming calls. She was on the telephone for about twenty-five minutes. Thereafter, the consent form was read to her and she signed it. A search revealed approximately $73,000 in cash, one million to five million dollars, in street value, of cocaine, a pager and large amounts of jewelry. Files containing receipts for large cash purchases and a laptop computer were also seized.

Blackman was then taken back down to the station and charged with one count of drug trafficking (R.C. 2925.03), one count of aggravated trafficking (R.C. 2925.03), possession of criminal tools (R.C. 2923.24), one count of permitting drug abuse (R.C. 2925.13), and one count of child endangerment (R.C. 2919.22).

Blackman entered a guilty plea to one count of possession of cocaine in less than the bulk amount one day prior to the suppression hearing. The trial court took issue, as we do, with Blackman's initial arrest:

"The defendant, co-defendant, Blackman, has entered a plea. It is for her—it was for her to raise this issue. I have not spent an inordinate amount of time in analyzing all of that and making a determination. I am not prepared to make a determination as to whether the arrest was proper or not. I need not do it, and it's a moot issue.

"However, I note it because, in my view, the events surrounding her arrest must be considered in analyzing whether, under the totality of the circumstances, the consent, which was ultimately given, was a voluntary one."

McMillan filed a motion to suppress which essentially argued that Blackman's consent was not voluntarily and freely given. The trial court agreed and suppressed the evidence. The state appeals and assigns three errors for our review:

"I. The trial court erred in determining Tonya Blackman's consent to search her apartment resulted from police coercion.

"II. The trial court erred in allowing William McMillan to assert Tonya Blackman's Fourth Amendment rights.

"III. The trial court erred in holding that Tonya Blackman's Sixth Amendment right to counsel attached at the moment of her arrest."

I

The state contends, in its first assignment of error, the trial court erred in determining that Blackman did not voluntarily and freely give her consent to search her apartment. We disagree but need not reach the exact issue of whether the consent was voluntary, as the evidence seized was derivative of an illegal custodial detention which operated to vitiate the ensuing consent.

Generally, searches that are conducted without a warrant issued upon probable cause violate the Fourth Amendment. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854. The voluntary nature of the consent is an issue of fact to be determined from the totality of the circumstances. *Schneckloth, supra,* at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 863. The standard of review on appeal regarding the issue of voluntariness is limited to a determination of whether the trial court's decision was "clearly erroneous." *State v. Hickson* (1990), 69 Ohio App.3d 278, 280, 590 N.E.2d 779, 780.

The question before us, however, is whether the search violated McMillan's Fourth Amendment rights. We hold that the search did indeed violate McMillan's constitutionally guaranteed right to be free from unreasonable searches and seizures.

In *Wong Sun v. United States* (1963), 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455, the Supreme Court stated that the question to be answered regarding the admissibility of derivative evidence is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation omitted.]" We hold that the evidence was "come at by the exploitation of that illegality," *viz.*, illegal custodial detention, illegal questioning, and subsequent illegal search.

If it had not been for the police's illegal custodial detention and transportation of Blackman to the police station, consent to search would never have been obtained. The consent given by Blackman was therefore fatally tainted, as she should not have been detained, arrested, held without an attorney present after repeated requests, and then told that she should consent as a search warrant would issue if she did not so comply. Accordingly, all evidence obtained subsequent to the initial illegal custodial taking of Blackman and the following

ineffective consent to search compels us to reach the conclusion that all evidence seized was derived from "fruit of the poisonous tree." *Wong, supra.*

Accordingly, the first assignment of error is overruled.

## II

In the state's second assignment of error, it advances the trial court erred in permitting McMillan to question the propriety of Blackman's arrest and to assert her Fourth Amendment rights.

First, the propriety of Blackman's arrest at McMillan's traffic stop, while technically moot for purposes of challenging her guilty plea, is a major factor in considering the court's granting of the motion to suppress.

Second, McMillan had standing to challenge the search as he had a possessory interest and a legitimate expectation of privacy in the subject apartment. *United States v. Payner* (1980), 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468, 474. The testimony at the suppression hearing established that McMillan lived with Blackman at the apartment in Gates Mills Towers. In fact, according to Blackman's testimony, the two had been living together for approximately one and one-half years and had a child together. The couple was temporarily living at the subject apartment while waiting for a house to be completed. As such, McMillan possessed a legitimate expectation of privacy in the subject apartment. However, because of the fatally flawed consent given by Blackman, all derivative evidence was correctly suppressed.

As McMillan had standing, and as a result of our disposition of the first assignment of error, the second assignment of error is overruled and the motion to suppress was properly granted.

## III

In the state's third assignment of error, it avers the trial court erred in finding that Blackman was denied her Sixth Amendment right to counsel. Specifically, the state contends that the trial court erroneously used this as a factor in determining Blackman did not voluntarily consent.

The state delves into the body of law which delineates when the right to counsel attaches. We need not reach whether the right to counsel attached in this case due to our disposition of the first assignment of error, *supra.* The lower court did not err in considering as one of the factors Blackman's repeated requests to speak to an attorney for purposes of the decision to grant the motion to suppress. This fact lends even more credence to our holding that Blackman was illegally taken into custody, illegally transported to the station, and illegally

questioned until she finally told the police what they wanted to hear. We therefore hold that the trial court correctly granted the motion to suppress.

*Judgment affirmed.*

HARPER, J., concurs.

KRUPANSKY, J., dissents.

KRUPANSKY, Judge, dissenting.

I respectfully dissent. The majority opinion affirming the suppression of evidence ignores well-settled principles governing the validity of third-party consent searches and is not supported by the record. The case should be remanded for trial since defendant, McMillan, failed to demonstrate the search conducted with the independent consent of Blackman violated his Fourth Amendment rights.

As noted by the majority, this court affirmed defendant's convictions for receiving stolen property, carrying a concealed weapon and having a weapon while under disability stemming from a traffic stop in the case *sub judice* since the record demonstrated defendant was lawfully stopped, validly arrested and no violation of defendant's Fourth Amendment rights. *State v. McMillan* (Sept. 16, 1993), Cuyahoga App. No. 62795, unreported, 1993 WL 372275. The appeal *sub judice* stems from the trial court's suppression of evidence subsequently obtained from a nearby apartment with the independent consent of defendant's girlfriend Blackman.

It is well established that a warrantless search of a shared apartment conducted with the voluntary consent of a co-resident does not violate the Fourth Amendment rights of the nonconsenting resident. *United States v. Matlock* (1974), 415 U.S. 164, 165–166, 94 S.Ct. 988, 990–991, 39 L.Ed.2d 242, 246–247; *State v. Sneed* (1992), 63 Ohio St.3d 3, 6–7, 584 N.E.2d 1160, 1164–1165; *State v. Greer* (1988), 39 Ohio St.3d 236, 240, 530 N.E.2d 382, 390, certiorari denied (1988), 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201. The standard for determining the validity of a consent to search under the Fourth Amendment is whether the consent was voluntarily made under the totality of the circumstances. *United States v. Watson* (1976), 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598; *State v. Barnes* (1986), 25 Ohio St.3d 203, 208–209, 25 OBR 266, 270–271, 495 N.E.2d 922, 926–927, certiorari denied (1986), 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 701; *State v. Childress* (1983), 4 Ohio St.3d 217, 4 OBR 534, 448 N.E.2d 155, certiorari denied (1983), 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152.

The trial court's findings in the case *sub judice* do not state that Blackman's written consent to search made while at the apartment was in fact involuntary and the record does not support such conclusion. Blackman, who had completed

two and one-half years of college education, repeatedly testified at the suppression hearing that the police did not use "coercion" to obtain her consent. She stated she was fully advised of her *Miranda* rights and right to refuse consent to the search and read the written consent to search form in her apartment prior to initialling and executing the document without threats or inducements of any kind. The consent form provided as follows:

"I, Tonya Blackman, agree to allow a consent search of my apartment, including all rooms located at 6805 Mayfield Road, Apartment 1107, by law enforcement officers of the Mayfield Heights Police Department for evidence, contraband, and instrumentalities of crimes. I waive the rights listed and initialled below:

"I have the right to refuse this search.

"I have the right to consult with my own lawyer prior to and during the search.

"I have the right to withdraw the consent for this search at any time and to limit the scope of this search.

"I am under no obligation nor pressure to allow this search.

"I also understand and initial the following information: Any evidence, contraband or instrumentalities of crime seized can be used to prosecute me as a criminal.

"I am the owner or person in charge of the item or premises to be searched.

"The police do not provide free lawyers for consent searches."

Blackman stated she initialled and executed the form after being transported to her apartment by the police and conducting several telephone calls. Blackman expressly reaffirmed the voluntariness of her consent in a written affidavit made while under oath when represented by counsel prior to the suppression hearing.

The trial court erroneously granted defendant's motion to suppress, without making any finding that Blackman's consent was actually involuntary, on the grounds that coercive circumstances were present when she signed the consent form, *viz.*: (1) she was in police custody and (2) was not represented by counsel. However, it is well established that the fact consent to search was made while in custody is insufficient by itself to demonstrate coercion as a matter of law. *United States v. Watson, supra,* 423 U.S. 411, at 424, 96 S.Ct. 820, at 828, 46 L.Ed.2d 598, at 609 (consent by defendant); see, also, *Frazier v. Cupp* (1969), 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684, 693–694 (consent by third-party). Moreover, even when raised by defendant to challenge his own personal consent rather than independent third-party consent to search, the combination of these two circumstances is insufficient to invalidate consent as a matter of law.

*State v. Childress, supra; State v. Rutter* (1990), 68 Ohio App.3d 638, 589 N.E.2d 421.

The majority opinion ignores this authority, stating it "need not reach the exact issue of whether the consent was voluntary," by contending Blackman's consent was the invalid product of an "illegal custodial detention." (Majority Opinion at p. 5.) However, the majority's reliance on *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, which involved the suppression of evidence resulting from an unlawful arrest, is misplaced since the trial court in the case *sub judice* expressly declined to determine the propriety of Blackman's arrest prior to her execution of the consent. Defendant clearly lacks standing to raise such an issue and to the extent the majority relies on such contention, the supporting factual determination should have been made by the trial court rather than for the first time on appeal. *United States v. Matlock, supra; Morales v. New York* (1969), 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299. Based on the record and trial court findings in the case *sub judice,* neither the fact of Blackman's detention nor the absence of counsel violated defendant's Fourth Amendment rights to warrant suppression of the evidence. See *State v. Childress, supra; State v. Rutter, supra.*

Even assuming the invalidity of Blackman's arrest, the record demonstrates contrary to the majority's argument that her subsequent consent to search was an independent act of free will and not the invalid result from the "illegal custodial detention" to warrant suppression of the evidence. See *United States v. Wellins* (C.A.9, 1981), 654 F.2d 550. Blackman stated her rights were fully explained to her and she did not execute the document at her apartment until after arranging for counsel during a telephone conversation with a friend. Blackman reaffirmed the voluntariness of her consent under oath while represented by counsel. Finally, to the extent that Blackman's consent to search resulted from an "illegal custodial detention" as the majority contends, the trial court's suppression of the evidence against defendant should nevertheless be reversed since defendant failed to establish a violation of his Fourth Amendment rights. *People v. Henley* (1981), 53 N.Y.2d 403, 442 N.Y.S.2d 428, 425 N.E.2d 816.

Since the majority fails to adequately address these issues, I respectfully dissent.